Thomas A. Kissane (Pro Hac Vice pending)
Schlam Stone & Dolan, LLP
26 Broadway
New York, NY 10004
212-344-5400
Fax: 212-612-1213
TKissane@schlamstone.com

Bret D. Lewis (State Bar No. 166819)
12304 Santa Monica Blvd.—107A
Los Angeles, California 90025
310-207-0696
Fax: 310-362-8424
Bretlewis@aol.com

Attorney for PLAINTIFF
JULIUS R. NASSO

## UNITED STATES DISTRICT COURT

### FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JULIUS R. NASSO, an individual<br><br>Plaintiff,<br><br>v.<br><br>INTEGRATED ADMINISTRATION, INC; an entity of unknown origin, INTEGRATED ADMINISTRATION, INC., a California corporation, NAILED LOAN ACQUISITION COMPANY, LLC, a Delaware limited liability company; KIARASH JAM, an individual, DAVID BERGSTEIN, an individual; EUGENE SCHER, an individual, and DOES 1-25,<br><br>Defendants. | Case No.<br><br>**Complaint for:**<br>**(1) Fraud**<br>**(2) Negligent Misrepresentation**<br>**(3) Breach of Contract**<br>**(4) Breach of Guaranty**<br>**(5) Unfair Competition**<br>**(6) Civil Conspiracy**<br><br>**JURY TRIAL DEMANDED** |

1

Plaintiff Julius R. Nasso ("Nasso") hereby alleges as follows:

**SUMMARY OF CLAIMS**

1.      This case involves a $600,000 investment that Nasso was fraudulently induced to make in an intended full length theatrical motion picture entitled "Nailed," a/k/a Accidental Love (the "Picture").

2.      Defendants misrepresented and concealed material facts to intentionally mislead Nasso concerning his security in the Picture, the priority of his rights to payment, the plan to distribute the Picture, and the parties' possession of its distribution rights.  After having made demand for payment, Nasso has received nothing but unfulfilled promises from Defendants in return for his $600,000 investment.

**THE PARTIES**

3.      Plaintiff Julius R. Nasso is a citizen and resident of the State of New York.

4.      Upon information and belief, Nailed Loan Acquisition Company, LLC ("Nailed Loan"), was an entity established to produce and release the Picture that is or was incorporated in the State of Delaware, but which at all material times was doing business in the county of Los Angeles, State of California, and which maintained its principal business office at 2425 Colorado Avenue, Suite #205, Santa Monica, California 90404.

5.      Defendant Kiarash Jam ("Kia Jam") is an individual who resides in the County of Los Angeles, State of California and is primarily engaged in the production of major motion

pictures that are theatrically released.  At all material times hereunder, Kia Jam was the president of Defendant Integrated Administration, Inc., and a producer of the Picture.  Upon information and belief, at all material times Kia Jam was an officer of Nailed Loan and authorized agent of Integrated Administration Inc.  Nasso had a pre-existing relationship with Kia Jam as of approximately August, 2012, because Jam had brokered two separate investments by Nasso in the theatrical motion pictures entitled "Getaway" and "Rekill".

6.     Defendant David Bergstein ("Bergstein") is an individual who resides in the County of Los Angeles, State of California.  Bergstein is engaged in the production of major motion pictures that are theatrically released and at all material times hereunder acted as an executive producer of the Picture.

7.     Defendant Eugene Scher ("Scher") is an individual who resides in the County of Los Angeles, State of California.  Scher is engaged in the production of major motion pictures that are theatrically released and at all material times hereunder was the manager of Defendant Nailed Loan and a producer of the Picture.

8.     Upon information and belief, Defendant Integrated Administration, Inc., is an entity that is or was incorporated in the State of Delaware, which at all material times was doing business in the county of Los Angeles, CA and maintained its principal business office at 2425 Colorado Blvd. Suite 205 Santa Monica, CA 90404.  Alternatively, Defendant Integrated Administration, Inc. is a corporation organized under the laws of the State of California and which at all material times was doing business in the county of Los Angeles, CA.  As used herein, the term "Integrated" shall refer to each of such entities.

**JURISDICTION AND VENUE**

9.     Jurisdiction in this Court is premised on diversity of citizenship, 28 USC § 1332(a)(1), plaintiff Nasso being diverse from all defendants and the amount in controversy

exceeding $75,000.00, exclusive of interest and costs.

10.    Defendants are properly subject to the subject matter jurisdiction of this Court because each defendant resides in the State of California and/or the matters complained of herein arose out of each defendants' transaction of business in the State of California.

11.    Venue is proper in this District under 28 USC § 1391(b) because one or more of the defendants resides in this District and all defendants are residents of the State of California, and/or because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## FACTUAL STATEMENT

12.    In or about October 2012, Kia Jam caused Jeff Kranzdorf ("Kranzdorf"), acting as agent to Bergstein and the other Defendants, to telephone Nasso to determine whether Nasso would consider investing in the Picture, which was already in production, almost completed, and which needed additional funding to complete the project.

13.    Upon information and belief, Kranzdorf is an who at all material times was involved in the business affairs of Defendants, including Nailed Loan and Integrated and, on information and belief, worked as an employee of the Defendants from the offices of Nailed Loan and Integrated at 2425 Colorado Blvd. Suite 205 Santa Monica, California 90404. Nasso had a preexisting relationship with Kranzdorf because Kranzdorf had represented Nasso in the past.

14.    With the assistance of Kranzdorf, in or about August 2012, Kia Jam had brokered investments from Nasso in two other unrelated films.

15.    On or about October 31, 2012, Nasso travelled to Los Angeles to meet with Kia Jam for purposes of discussing more fully his proposed investment in the Picture.

16.    On October 31, 2012, Nasso attended a meeting with Kia Jam and Kranzdorf at the offices of Nailed Loan and Integrated, which were located at 2425 Colorado Blvd. Suite 205

Santa Monica, California 90404.

17.     Kia Jam attended the October 31 meeting holding himself out as a producer of the Picture, as well as an officer of both Integrated and Nailed Loan.  Like Kranzdorf, who also attended the meeting, Kia Jam was acting as agent and employee for Defendants.  Specifically, Kranzdorf was acting at the express direction of Bergstein at this meeting as in all of his substantive communications with Nasso concerning Nasso's investment in the Picture.

18.     During the course of the   meeting, Kia Jam represented to Nasso that: (i) Defendants had an investment opportunity for Nasso to invest in the Picture, which featured prominent  actors  Jessica Biel, Jake Gyllenhall, James Marsden, Cathleen Keener, Kirstie Alley, Tracy Morgan, James Brolin and Paul Ruben, and which was based on a screenplay by Kristen Gore, the daughter of the former Vice President of the United States,  Albert Gore; (ii) the Picture was almost  complete, although  the director, David O. Russell, purportedly had unjustifiably resigned after being paid $6,000,000, and before he could film the opening scene, which had been saved for last; (iii) the Picture, including the copyright thereon, was owned by Nailed Loan; (iv) David Bergstein was an executive producer of the Picture, and he himself  had already invested a substantial sum in the Picture and in Nailed Loan; and (v) a final bridge loan of $600,000 was required to film the opening scene and complete the Picture.

19.     Kia Jam further represented to Nasso at the  meeting that if Nasso invested $600,000 to complete the Picture (i) Nasso's investment in the Picture would be adequately secured by the copyright of the Picture and the proceeds thereof; (ii) Nasso would receive first monies earned from the Picture on the basis of "last monies in and first monies out," with Nasso's $600,000 investment being the last monies invested in the Picture and (iii) there would be a theatrical release of the Picture by Defendants, who also owned the right to distribute the Picture.

20.     After he returned to New York, Nasso received a telephone call from Bergstein

5

who, in his claimed individual capacity as an executive producer of the Picture and in his claimed corporate capacity as an officer of both Integrated and Nailed Loan, further discussed, encouraged and induced Nasso's $600,000 investment in the Picture.

21.     During this telephone call, Bergstein reiterated what Nasso had previously been told, namely, that (i) Defendants had an investment opportunity for Nasso to invest in the Picture, which featured prominent major actors stars Jessica Biel, Jake Gyllenhall, James Marsden, Cathleen Keener, Kirstie Alley, Tracy Morgan, James Brolin and Paul Ruben, and which was based on a screenplay by Kristen Gore, the daughter of the former Vice President of the United States,  Albert Gore; (ii) the Picture was almost complete, although  the director, David O. Russell, purportedly had unjustifiably resigned after being paid $6,000,000, and before he could film  the opening scene, which had been saved for last; (iii) the Picture, including the copyright thereof, was owned by Nailed Loan; (iv) David Bergstein was an executive producer of the Picture, and he himself  and had already invested a substantial sum in the Picture and in Nailed Loan; and (v) a final bridge loan of $600,000 was required to film  the opening scene and complete the Picture.

22.     During the call, Bergstein  assured Nasso that  if he invested $600,000 to complete the Picture, that: (i) his  investment in the Picture would be adequately secured by the copyright of the Picture and the proceeds thereof; (ii)  he  would receive the first monies earned from the Picture on the basis of "last monies in and first monies out," with Nasso's investment being the last monies invested in the Picture and (iii) there would be a theatrical release of the Picture by Defendants, who owned the copyright therein and corresponding right to distribute the Picture.

23.     Based on Nasso's justifiable reliance upon Defendants' false statements, misrepresentations, and concealments of facts as alleged above, on or about November 5, 2012, Nasso transferred $600,000 to Defendants, via wire transfer, for the purpose of investing in and

completing the Picture.

24.    In exchange for the receipt of $600,000 from Plaintiff, and as a material inducement for Nasso to invest these funds in the Picture, the Defendants caused the following documents to be prepared, executed and delivered:

- a "Secured Promissory Note" from Integrated, dated November 1, 2012 (the "Note"), for the benefit of Nasso in the principal amount of $600,000. A true and correct copy of the Note is attached hereto as **Exhibit 1**. Pursuant to the terms of the Note, Integrated promised to pay to Nasso the principal sum of $600,000 on February 4, 2013, together with such additional fees and interest thereon as set forth in the Note. The Note was signed by Kia Jam, as President of Integrated, and falsely represented that Integrated was a Delaware, as opposed to a California, corporation.

- a written "Copyright Mortgage and Assignment" ("Copyright Mortgage") from Nailed Loan to Nasso. A true and correct copy of the Copyright Mortgage is attached hereto as **Exhibit 2**. Pursuant to the terms of the Copyright Mortgage, Plaintiff was granted, inter alia, a security interest in the copyright in the screenplay entitled "Nailed" aka Accidental Love. The Copyright Mortgage was signed by defendant Gene Scher as "Manager" of Nailed Loan.

- a written "Continuing Corporate Guaranty Agreement" ("Guaranty Agreement"), from Nailed Loan to Nasso, guaranteeing all of the obligations promised to Nasso by Integrated under the Note including, without limitation, the obligation to pay principal, interest and fees due thereon. A true and correct copy of the Guaranty Agreement is attached hereto as **Exhibit 3**. The Guaranty Agreement was signed by defendant Scher as "Manager" of Nailed Loan", and by Kia Jam as "authorized signer" for Integrated.

25.    On information and belief, contrary to Defendants' representations to Nasso to induce him to invest, the true facts were: (i) Defendants had previously encumbered the Picture, as well as the copyright therein, to secure substantial prior loans from other parties or, in the alternative, did not own the rights or copyright, meaning that Integrated and Nailed Loan could not give Nasso a priority secured interest, and that as a result, (ii) Nasso could not be paid on a

last-in-first-out basis; and (iii) Defendants did not own the copyright and corresponding right to distribute the Picture. Had Plaintiff known these true facts, he would never have invested $600,000 in the Picture.

26.    Kranzdorf acted at the direction of, and reported to, Bergstein in connection with his efforts to secure the $600,000 from Nasso.

27.    Plaintiff has demanded the repayment of all amounts due under the Note and Guaranty from Defendants.  However, no payments have been made to Plaintiff by or on behalf of any Defendant.

28.    After the investment was made, Kranzdorf told Nasso that Scher wanted to meet with him to express thanks for his investment.

29.    Plaintiff travelled to Los Angeles and met for lunch with Scher and Kranzdorf at the Beverly Hills Plaza Hotel on or about November 9, 2012.

30.    During the course of the lunch, Scher expressed his thanks to Nasso for "saving the film," and then proceeded to discuss plans for distribution.  Scher told Plaintiff, "we couldn't have done it without you."

31.    The Note came due February 4, 2013, but Plaintiff did not receive any payment, despite his demand.

32.    In late January 2013, Defendants exercised their unilateral right under the Note to invoke an additional two-week extension in exchange for an additional $20,000.  As a result, instead of $660,000 being due at February 4, 2013, $680,000 was due at February 18, 2013.

33.    By email dated March 22, 2013, Bergstein, through Kranzdorf, assured Nasso that Nasso would be paid on the Note the following week.  ("David [Bergstein] advised the transfer to your account will be made Wed or Thurs.")  This email was copied by Kranzdorf to Bergstein and Kia Jam.

34.  May 2013, Bergstein, through Kranzdorf, assured Nasso that he was personally arranging for payment of the full amount due under the Note.  Specifically, Kranzdorf wrote Nasso: "I just hung up with David [Bergstein] and he has gone ahead as promised and liquidated securities sufficient to make the payment of the $700,000 to you."  This email was copied by Kranzdorf to Bergstein.

35.  Nasso has never been paid any portion of the $600,000 he lent, nor the additional $80,000 due upon maturity, nor any other amount by any Defendant.

36.  In or about April 2015, Nasso learned that sometime in 2014, a separate entity named Nailed Partners, LLC, had entered into a distribution agreement with an entity named Millennium Films to distribute the Picture.  On information and belief, Millennium Films paid Nailed Partners $500,000 for the right to distribute the Picture.

37.  At no time did any Defendant, directly or indirectly, inform Nasso that the distribution rights for the picture had been transferred from Nailed Loan to Nailed Partners, LLC, Millennium, or any other entity.  Nor did Nasso receive any payment thereon.

38.  On information and belief, at all times mentioned herein each Defendant was the agent and employee of each and every  other Defendant, and that in doing all acts herein alleged, was acting within the course and scope of such agency and employment, with the permission, consent and knowledge of the other Defendants.

39.  Upon information and belief, at all times herein mentioned:

    A.    The individual Defendants named as parties herein, dominated, controlled and influenced, and now dominate, control, and influence the corporate and/or entity Defendants sued herein, if any, and the other officers, as well as the business, property and other officers of said corporate and/or entity Defendants, if any.

    B.    At all times since their incorporation, said corporate and/or entity Defendants have been, and now are, a mere shell and naked, undercapitalized framework which said individual

Defendants have used, and do now use, as conduits for the conduct of their personal business and/or property affairs, and/or as obligor for the assumption of obligations and/or liabilities incapable of performances by said corporate and/or entity Defendants, which are the obligations and liabilities of said individual Defendants.

C.    The individual Defendants created the corporate and/or entity Defendants, which are being operated pursuant to a scheme, plan and design conceived by said individual Defendants whereby the income, revenue and profits of said corporate and/or entity Defendants are and/or have been converted by the individual Defendants.

D.    There is such a unity of interest and control between the corporate and/or entity Defendants on the one hand, and said individual Defendants on the other hand, such that the individuality and separateness of said corporate and/or entity Defendants and of said individual Defendants has ceased. Adherence to the fiction of separate existence of said corporate and/or entity Defendants shall improperly sanction inequity and promote injustice; and

E.    The individual Defendants held and do now hold substantial interest in the corporate and/or entity Defendants.

40.    Upon information and belief, Nailed Loan and its officers, at all times herein mentioned acted in respect to Integrated and its businesses and properties in the same manner as the individual Defendants acted in respect to the corporate Defendants named herein, and as set forth in paragraph 39 above.

41.    By reason of the foregoing, the individual Defendants are responsible for the obligations undertaken toward Nasso by the corporate Defendants.

**FIRST CAUSE OF ACTION**
**(Fraud against All Defendants)**

42.    Plaintiff realleges and incorporates by reference Paragraphs 1 through 41 as though fully set forth herein.

43.    At the time Defendants made the above-mentioned false representations to Plaintiff, Defendants knew they were false.

44.     As a direct and proximate result of the fraudulent conduct, i.e., the false statements, artifices and schemes of the  Defendants as alleged above, Nasso has been damaged in excess of $660,000, to be proven at trial.

45.     The conduct of the Defendants as described above was and is despicable and done to vex and injure Plaintiffs with a willful and conscious disregard of Plaintiff's rights, constituting oppression, fraud, and/or malice. Defendants ignored Plaintiffs' interests and concerns and consciously placed their own economic interests first, all with the requisite intent to injure Plaintiff within the meaning of California Civil Code Section 3294.  Plaintiff is entitled to recover punitive damages from Defendants in an amount sufficient to punish Defendants and to make an example of them in order to deter similar conduct in the future.

## SECOND CAUSE OF ACTION
### (Negligent Misrepresentation against All Defendants)

46.     Plaintiff realleges and incorporates by reference paragraphs 1 through 45 as though fully set forth herein.

47.     At the time Defendants made the above-mentioned false representations to Plaintiff, Defendants intended for Plaintiffs to rely on said representations.   Defendants representations were not true and Defendants has no reasonable basis to believe they were true.

48.     Plaintiff was harmed as a result of Defendants representations and that Plaintiff's reliance thereon was a substantial factor in causing Plaintiff's harm.

49.     As a direct and proximate result of the conduct of Defendants as alleged above, Plaintiffs have been damaged in excess of $660,000, to be proven at trial.

## THIRD CAUSE OF ACTION
### (Breach of Contract/Promissory Note against Defendants
### Integrated, Kia Jam, Bergstein and Scher)

50.     Plaintiff realleges and incorporates by reference paragraphs 1 through 49 as though fully set forth herein.

11

51.     Defendant Integrated has breached the terms and conditions of the Note by failure to pay the principal, fees, and interest due thereon in accordance with the terms of the Note.

52.     Plaintiff has performed all conditions, covenants, and promises required on his part to be performed in accordance with the terms and conditions of the Note.

53.     Defendants Kia Jam, Bergstein and Scher are responsible for the obligations of Defendant Integrated under the Note because they used the corporate form of Integrated as alleged at ¶ 39, in an effort to protect themselves from personal liability for the material misrepresentations they made or caused to be made in order to induce Nasso to part with his money.

54.     As a direct result of Defendants' breach, Plaintiff has been damaged in an amount excess of $660,000 to be proven at trial.

55.     The Note provides that Plaintiff is entitled to attorney's fees, costs of collection, costs, and expenses of this lawsuit.

### FOURTH CAUSE OF ACTION
**(Breach of Guaranty against Defendants Nailed Loan, Kia Jam, Bergstein and Scher )**

56.     Plaintiff realleges and incorporates by reference Paragraphs 1 through 55 as though fully set forth herein.

57.     Defendant Nailed Loan has breached the terms and conditions of the Guaranty by failure to pay the principal, fees, and interest due thereon in accordance with the terms of the Note and Guaranty.

58.     Plaintiff has performed all conditions, covenants, and promises required on his part to be performed in accordance with the terms and conditions of the Guaranty.

59.     Defendants Kia Jam, Bergstein and Scher are responsible for the obligations of Defendant Nailed Loan under the Guaranty because they used the corporate form of Nailed Loan,

as alleged at ¶ 39, in an effort to protect themselves from personal liability for the material misrepresentations they made or caused to be made in order to induce Nasso to part with his money.

60.     As a direct result of Defendants' breach of the Guaranty, Plaintiff has been damaged in an amount excess of $660,000 to be proven at trial.

61.     The Guaranty provides Plaintiff is entitled to attorney's fees, costs of collection, costs, and expenses of this lawsuit.

## FIFTH CAUSE OF ACTION
### (Unfair Competition against all Defendants)

62.     Plaintiff realleges and incorporates by reference Paragraphs 1 through 61 as though fully set forth herein.

63.     The acts of Defendants as set forth above constitute unfair and fraudulent business acts and practices in violation of California Business & Professions Code Section 17200 et seq.

64.     By reason of these unfair and fraudulent business acts and practices on the part of Defendants, Defendants have wrongfully deprived Plaintiffs of the monies loaned pursuant to the Note, as well as the interest and fees due thereon and expected thereunder.

65.     Plaintiff is entitled to restitution of $600,000 plus damages to be proven at trial.

## SIXTH CAUSE OF ACTION
### (Civil Conspiracy against all Defendants)

66.     Plaintiff realleges and incorporates by reference Paragraphs 1 through 65 as though fully set forth herein.

67.     Defendants agreed, and knowingly and willfully conspired and acted in concert between and amongst themselves and, upon information and belief, with one or more of the John Doe Defendants to defraud Plaintiff to obtain $600,000, to use towards completion of the Picture or otherwise.

68.    Defendants' conduct described herein was done with a conscious disregard of Plaintiff's rights and with the intent to vex, injure or annoy Plaintiff, such as to constitute oppression, fraud or malice under California Civil Code Section 3294, entitling Plaintiff to punitive damages which should be an amount appropriate to punish or set an example of Defendants.

**WHEREFORE, PLAINTIFF** prays judgment as follows;

Judgment in the amount in excess of $660,000, to be proven at trial, against all Defendants;

Pre-judgment and post judgment interest at the legal rate according to proof; Punitive damages to the extent allowed by law and to set an example of Defendants;

For reasonable attorneys' fees and expenses under Civil Code §1717 as allowed by agreement;

For costs of suit herein incurred; and

For such other relief as the court may deem proper.

Date: November 1, 2015

Respectfully submitted,
BRET D. LEWIS (State Bar. 166819)


By  /s/ Bret D. Lewis
Bret D. Lewis, Esq.
Attorney for Plaintiff Julius R. Nasso

14

# EXHIBIT 1

1

## SECURED PROMISSORY NOTE
### ["Note"]

**$600,000.00 (USD)**

Santa Monica, California
November 1, 2012

  **FOR VALUE RECEIVED, INTEGRATED ADMINISTRATION, INC.**, a Delaware corporation ("Maker"), promises to pay to the order of **JULIUS R. NASSO** ("Holder") the principal sum of **SIX HUNDRED THOUSAND DOLLARS ($600,000.00)** ("Principal"). Holder shall be paid a one-time financing fee/ interest payment under this Note in the amount of **SIXTY THOUSAND DOLLARS ($60,000.00)** (the "Fee"), which shall be due and payable on the Maturity Date. Principal and the Fee shall be due and payable on February 4, 2013 (the "Maturity Date"). The HOLDER has agreed to an allowable 2-weeks extension for an additional sum of **TWENTY THOUSAND DOLLARS ($20,000.00)** ("Additional Fee"). Such extension may be made at the election of the Maker by and upon written notice to the Holder. In the event such election is made, the Additional Fee shall be due and payable concurrent with the Fee on the Maturity Date.

  In the event that the Principal and Fee (including, as applicable, the Additional Fee) is not paid in full to Holder on or before the Maturity Date, Maker and Holder agree that Maker will pay to Holder additional fees in the amount of **FORTY TWO THOUSAND FIVE HUNDRED ($42,500.00)** per consecutive calendar month (based on a 30 day month); commencing with and including every day that extends beyond the Maturity Date and or the Maturity Date plus the 2 week allowable extension (but subject to and conditioned upon Maker's payment of the Additional Fee); hereinafter provided for.

  1. Calculation of Interest. All interest due hereunder shall be computed on the basis of a year of 360 days for the actual number of days elapsed from the date on which the Principal is provided to Maker until the date of repayment (Principal and Fee) to the Holder. Unless accelerated as provided in this Note, the entire Fee shall be payable on the Maturity Date.

  2. Payment.

  (a) All amounts payable hereunder are payable in immediately available U.S. funds, without setoff or deduction of any kind or nature. Any payment received by Holder after 5:00 PM, Pacific Time shall be considered for all purposes (including the calculation of interest and late charges) as having been made on the next following day which is not a Saturday, Sunday, or legal holiday ("business day"); if the date for any payment hereunder falls on a day which is not a business day, then, for all purposes of this Note, the same shall be deemed to have fallen on the next following business day, and such extension of time shall in such case be included in the computation of interest.

Maker's Initials Here: _ADF_
ADF, LLC

2

(b) All payments on this Note shall be applied first to the payment of late charges and other sums, if any, owing hereon other than interest or principal, then to the Fee, then accrued and unpaid interest, if any, and the remainder thereof shall be applied to the reduction of the unpaid principal balance of this Note.

(c) Payments on this Note, as well as any notices to Holder, shall be mailed or delivered to Holder whose address for this purpose only is 16 Wakefield Road, Staten Island, NY 10312 or to such other place (including payment by electronic bank-to-bank wire transfer, as per the instructions set forth below) as Holder may from time to time direct by written notice to Maker.

Principal and interest shall be payable to Lender by wire transfer to _____ Bank, ABA #_____, _____, _____, Beneficiary Account No. _____, Beneficiary: Julius R. Nasso, Reference: *"Nailed"* (or to such other address or account as Lender may designate in writing).

3.  Default.

(a) Any of the following shall constitute an "Event of Default" hereunder:

(i)    Failure of Maker to pay any amount (whether of principal, fees/interest or otherwise) when due hereunder; or

(ii)         The entry of an order for relief under the Federal Bankruptcy Code as to Maker or entry of any order appointing a receiver or trustee for Maker or approving a petition in reorganization or other similar relief under bankruptcy or similar laws in the United States of America or any other competent jurisdiction, which order, if involuntary, is not dismissed or stayed within sixty (60) days after entry thereof; or making a general assignment for the benefit of creditors; or admitting in writing inability to pay debts as they mature.

(iii) The uncured material breach of any provision set forth in this Note.

(b) Remedies.  Upon the occurrence of an Event of Default, the principal of this Note and accrued fees and interest thereon and all other amounts payable hereunder shall be immediately due and payable without demand, protest or notice of any kind.

(c) Default Interest.  During the time that any Event of Default has occurred and is continuing, interest shall accrue on the outstanding principal amount hereof at 12% per annum.

4.  Prepayment.  This Note may be prepaid at Maker's option, in whole or in part, without penalty prior to the Maturity Date.  Any such prepayment shall be made together with the Fee (including, to the extent applicable, the Additional Fee and any late charges).

Maker's Initials Here: _ADF_
ADF, LLC

3

5. No Waiver of Remedies.  Holder's failure to exercise any right or remedy provided herein or at law upon any default of Maker shall not constitute a waiver of Holder's right to exercise the same or any other option, right, or remedy at any subsequent time in respect of the same event or any other Event of Default, and Maker hereby expressly waives the benefit of every statute or rule of law or equity which would produce a result contrary to or in conflict with the foregoing.

6. Remedies Not Exclusive.  No remedy herein conferred upon Holder is intended to be exclusive of any other remedy herein or in any other agreement between the parties hereto or by law provided or permitted, but each shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law, in equity or by statute.

7. Acceptance of Partial Payment.  The acceptance by Holder of any payment hereunder which is less than payment in full of any amount due and payable by the time of such payment shall not constitute a waiver of the right to exercise any option, right, or remedy at that time or at any subsequent time, nor shall it nullify any prior exercise of any such option, right, or remedy without the express written consent of Holder.

8. Governing Law, Venue and Jurisdiction.  This Note shall be construed according to the laws of the State of California. Maker hereby submits to personal jurisdiction in said State (and to venue in the Superior Court of California in the City and County of Los Angeles) for the enforcement of Maker's obligations hereunder, and waives any and all personal rights under the law of any other jurisdiction to object to such personal jurisdiction and venue within said state, city and county. This Note may not be changed orally but only by an agreement in writing signed by both Maker and Holder (or Holder's successor in interest as the case may be).

9. Collection Fees.  Except as otherwise provided herein, Maker shall pay all costs of collection, including reasonable attorneys' fees and all costs of suit and preparation for such suit (and whether at trial or appellate level), in the event that any amount payable hereunder is not paid when due, or if at any time Holder should incur any attorneys' fees in any proceeding under the Federal Bankruptcy Code (or other similar laws for the protection of debtors generally) in order to collect any indebtedness hereunder or to preserve, protect or realize upon any security for, or guarantee or surety of, such indebtedness whether suit be brought or not, and whether through courts of original jurisdiction, as well as in courts of appellate jurisdiction, or through a bankruptcy court or other legal proceedings.  This Note is executed under, and shall be governed by and construed in accordance with, the laws of the State of California. In any action brought under or arising out of this Note, Borrower hereby consents to the jurisdiction of any competent court within the State of California and consents to service of process by any means authorized by California law. Borrower hereby waives any right, which Borrower may have to transfer, or change the venue of any action brought by the holder of this Note.

Maker's Initials Here: *ADF LLC*
ADF, LLC

4

10. Usury.  All agreements between Maker and Holder are expressly limited so that in no contingency or event whatsoever, whether by reason of payment of extension, loan, or commitment fees, of advancement of proceeds, acceleration of maturity of the unpaid principal balance hereof or otherwise, shall the amount paid or agreed to be paid to Holder for the use, forbearance or detention of the principal amount hereof exceed the maximum legal rate permissible under any law which a court of competent jurisdiction may deem applicable hereto. If, from any circumstance whatsoever, fulfillment of any provision of this Note at the time performance of such provision shall be due, shall involve exceeding the maximum legal rate of interest prescribed by law which a court of competent jurisdiction may deem applicable hereto or thereto, then, ipso facto, the obligation to be fulfilled shall be reduced to the limit of such maximum rate, and if from any circumstance Holder shall ever receive as interest an amount which would exceed said maximum legal rate, such amount which would be excessive interest shall be applied to the reduction of the unpaid principal balance due hereunder and not to the payment of interest; to the extent that such excessive amount exceeds the unpaid principal balance hereon, Holder shall refund it to Maker. In determining whether excessive interest would be charged hereon, to the extent permitted by applicable law, all sums paid or agreed to be paid to Holder for the use, forbearance, or detention of the indebtedness evidenced hereby outstanding from time to time shall be prorated, amortized, allocated and spread from the date of disbursement of the proceeds of this Note until payment in full of the unpaid principal sum so that the actual rate of interest on account of such indebtedness is uniform throughout the term hereof. This provision shall control every other provision of all agreements between Maker and Holder.

11. Assignment.  Holder may assign this Agreement, in whole or in part, in its sole and absolute discretion.  The rights and obligations under this Agreement shall inure to the benefit of and shall be binding upon the successors, affiliates, representatives and assigns of Holder. Maker may not delegate any of its obligations hereunder and any attempted delegation of the same shall be a default hereunder, accelerating the Maturity Date hereof to the date of the attempted delegation; which shall be for all purposes null and void *ab initio*.

12. Additional Documents.  Maker agrees to promptly execute, acknowledge and deliver any additional documents, instruments and the like and otherwise promptly to take all such other actions as Holder may deem necessary or advisable, from time to time, to effectuate the purposes of this Note.

13. Additional  Consideration-Motion Picture Producer Credit.  As a material inducement for Holder's loan to Maker hereunder, Maker hereby agrees that Holder shall be individually credited as an "executive producer" of Maker's motion picture currently and tentatively entitled "Nailed" ("Picture") starring Jessica Biel, Jake Gyllenhall, James Marsden, Cathleen Keener, Kirstie Alley, Tracy Morgan, James Brolin and Paul Rubens. Such credit shall appear on a shared card  (with no more than one other credited executive producer) in the main titles of the Picture and shall be reprised in all non-excluded paid ads; and home video packaging; and in the Picture's billing block.  Other

Maker's Initials Here: _____
ADF, LLC

5

than its positioning, all other characteristics of the same (size, duration, style and prominence) shall be generally tied to all other executive producers of the Picture. Holder and Maker shall sign an appropriate short form agreement or certificate of proceeds to the effect of this paragraph 13 as soon hereafter as may be practicable. In the event such further instrument shall not be executed, this paragraph 13 shall serve to fully bind Maker to the extent of the terms specified in this paragraph 13.

14. Notices.  All notices to Maker hereunder shall be validly given if in writing and delivered personally or sent by certified mail, postage prepaid, to the office of Maker at 2425 Colorado Avenue, Suite #205, Santa Monica, California 90404 or such other address as Maker may from time to time designate in writing.  All notices to Holder hereunder shall be validly given if in writing and delivered personally or sent by certified mail, postage prepaid, to the Holder at 16 Wakefield Road, Staten Island, NY 10312, or such other address as Holder may from time to time designate in writing to Maker by certified mail, postage prepaid.

15. Severability.  Maker and Holder intend that all of the provisions hereof shall be valid and enforceable as specifically set forth, including, without limitation, the provision permitting acceleration upon alienation of the Property. If any provision hereof is declared to be invalid or unenforceable, it is the intention of Maker and Holder that the remainder of this document, or, if applicable, the remainder of the invalid or unenforceable clause, sentence, or paragraph, shall be valid and enforced to the fullest extent permitted.

16. Binding Effect.  This Note shall be binding upon the parties hereto and their respective heirs, executors, administrators, representatives, successors and permitted (in the case of Maker) assigns.

17. Mutually Drafted.  This Note and any ambiguities or uncertainties contained in this Note shall be equally and fairly interpreted for the benefit of and against both parties to this Note and shall further be construed and interpreted without reference to the identity of the party or parties preparing this document, it being expressly understood and agreed that the parties hereto participated equally in the negotiation and preparation of this Agreement or have had equal opportunity to do so.  Accordingly, Maker and Holder hereby waive the legal effect of California Civil Code §1654 or any successor and/or amended statute, which in part states that in cases of uncertainty, the language of the contract should be interpreted most strongly against the party who caused the uncertainty to exist.

18. Miscellaneous.  This Note is issued pursuant to the Copyright Mortgage & Assignment ("Mortgage") executed and delivered by Maker to Holder concurrently herewith and is subject to all of the terms and conditions thereof and is secured as set forth in the Mortgage. Borrower hereby waives protest, diligence, presentment, demand for payment, notice of default or nonpayment, notice of dishonor, and all other demands and notices in connection with the delivery, acceptance, performance and enforcement of this Note, and, to the fullest extent permitted by law, all rights to assert any statute of

Maker's Initials Here: *ADF*
ADF, LLC

6

limitations to an action hereunder.  Time is of the essence with respect to the performance of each and every covenant, condition, term and provision hereof. This Note constitutes the entire agreement of the parties hereto in connection with the transactions contemplated hereby and thereby, and shall supersede any prior expressions of intent or understanding with respect to such transactions.  This Note may be amended, but only by an instrument in writing signed by both Maker and Holder.

        EXECUTED as of the day and year first written above.

Integrated Administration, Inc.

By: _____
        Kia Jam, its President

Maker's Initials Here: _ADF____
ADF, LLC

# EXHIBIT 2

## COPYRIGHT MORTGAGE AND ASSIGNMENT

**KNOW ALL MEN BY THESE PRESENTS** that for good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the undersigned, **NAILED LOAN ACQUISTION COMPANY, LLC**, a Delaware limited liability company with an address of 2425 Colorado Avenue, Suite #205 Santa Monica, California 90404 ("Mortgagor"), does hereby mortgage, assign, grant, convey and transfer for security to **JULIUS R. NASSO**, an individual with an address of 16 Wakefield Road, Staten Island, New York 10312 ("Mortgagee") and his successors, heirs, licensees and assigns, throughout the universe in perpetuity, all right, title and interest of every kind and nature, without limitation, in and to all copyrights and rights and interests of every kind or nature in copyrights and works protectable by copyright, whether now owned or hereafter created or acquired, all renewals and extensions thereof, and all accounts receivable related thereto and all other cash and non-cash proceeds therefrom, and all of the collateral related thereto or derived therefrom described in Exhibit "A" hereto (collectively the "Collateral"), in and to that certain screenplay (the "Screenplay"), and the motion picture based upon and derived from the Screenplay (the "Picture"), currently entitled *NAILED* and in and to the copyright and all rights and interests of every kind or nature, without limitation, in and to all works based upon, incorporated in, derived from, incorporating or relating to the Screenplay or the Picture or from which the Screenplay or the Picture are derived.  The Screenplay and the Picture are collectively referred to herein as the "Work."

Mortgagor agrees that if any person, firm or corporation does or performs any acts which, in Mortgagee's opinion, constitutes copyright infringement with respect to the Work or constitutes plagiarism, or violates or infringes any of Mortgagor's or Mortgagee's rights with respect to the Work, or any part thereof, or if any person, firm or corporation does or performs any acts which, in Mortgagee's opinion, constitutes an unauthorized or unlawful distribution, exhibition or use of the Work, or any part thereof, then, in such event, Mortgagee may, and shall have the right to, take such steps and institute such suits or proceedings as Mortgagee may deem reasonable or necessary to prevent such acts and conduct and to secure damages and other relief by reason thereof, and to generally take such steps as may be advisable, necessary or proper for the full protection of the parties' rights.  Mortgagee may take such steps or institute such suits or proceedings in its own name, in Mortgagor's name or in the names of the parties jointly.

Mortgagor hereby irrevocably constitutes and appoints Mortgagee as its lawful attorney-in-fact to do all acts and things permitted or contemplated by the terms hereof and pursuant to the Loan and Security Agreement referred to below.  Without limiting the generality of the foregoing, the conveyance and assignment contained herein includes all prior choses-in-action, at law, in equity and otherwise, the right to recover all damages and other sums, and the right to other relief allowed or awarded at law, in equity, by statute or otherwise.

[THE REMAINDER OF THIS PAGE HAS BEEN LEFT INTENTIONALLY BLANK BELOW THIS LINE]

INITIAL HERE:

NLAC          JRN

1

## <u>COPYRIGHT MORTGAGE AND ASSIGNMENT</u>

**KNOW ALL MEN BY THESE PRESENTS** that for good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the undersigned, **NAILED LOAN ACQUISTION COMPANY, LLC**, a Delaware limited liability company with an address of 2425 Colorado Avenue, Suite #205 Santa Monica, California 90404 ("Mortgagor"), does hereby mortgage, assign, grant, convey and transfer for security to **JULIUS R. NASSO**, an individual with an address of 16 Wakefield Road, Staten Island, New York 10312 ("Mortgagee") and his successors, heirs, licensees and assigns, throughout the universe in perpetuity, all right, title and interest of every kind and nature, without limitation, in and to all copyrights and rights and interests of every kind or nature in copyrights and works protectable by copyright, whether now owned or hereafter created or acquired, all renewals and extensions thereof, and all accounts receivable related thereto and all other cash and non-cash proceeds therefrom, and all of the collateral related thereto or derived therefrom described in Exhibit "A" hereto (collectively the "Collateral"), in and to that certain screenplay (the "Screenplay"), and the motion picture based upon and derived from the Screenplay (the "Picture"), currently entitled "*NAILED*" and in and to all works based upon, incorporated in, derived from, incorporating or relating to the Screenplay or the Picture or from which the Screenplay or the Picture are derived. The Screenplay and the Picture are collectively referred to herein as the "Work."

Mortgagor agrees that if any person, firm or corporation does or performs any acts which, in Mortgagee's opinion, constitutes copyright infringement with respect to the Work or constitutes plagiarism, or violates or infringes any of Mortgagor's or Mortgagee's rights with respect to the Work, or any part thereof, or if any person, firm or corporation does or performs any acts which, in Mortgagee's opinion, constitutes an unauthorized or unlawful distribution, exhibition or use of the Work, or any part thereof, then, in such event, Mortgagee may, and shall have the right to, take such steps and institute such suits or proceedings as Mortgagee may deem reasonable or necessary to prevent such acts and conduct and to secure damages and other relief by reason thereof, and to generally take such steps as may be advisable, necessary or proper for the full protection of the parties' rights. Mortgagee may take such steps or institute such suits or proceedings in its own name, in Mortgagor's name or in the names of the parties jointly.

Mortgagor hereby irrevocably constitutes and appoints Mortgagee as its lawful attorney-in-fact to do all acts and things permitted or contemplated by the terms hereof and pursuant to the Loan and Security Agreement referred to below. Without limiting the generality of the foregoing, the conveyance and assignment contained herein includes all prior choses-in-action, at law, in equity and otherwise, the right to recover all damages and other sums, and the right to other relief allowed or awarded at law, in equity, by statute or otherwise.

[THE REMAINDER OF THIS PAGE HAS BEEN LEFT INTENTIONALLY BLANK BELOW THIS LINE]



This instrument shall be binding upon the parties and (as applicable) their respective successors, heirs, assigns and personal representatives.

IN WITNESS WHEREOF, Mortgagor has executed this Copyright Mortgage and Assignment as of the day and year set forth below.

NAILED LOAN ACQUISITION COMPANY, LLC
A Delaware Limited Liability Company

By: _____

Its: _____MANAGER_____


Agreed to and Accepted:

_____
Julius R. Nasso

INITIAL HERE _____
NLAC    JRN

2

This instrument shall be binding upon the parties and (as applicable) their respective successors, heirs, assigns and personal representatives.

IN WITNESS WHEREOF, Mortgagor has executed this Copyright Mortgage and Assignment as of the day and year set forth below.

NAILED LOAN ACQUISITION COMPANY, LLC
A Delaware Limited Liability Company

By: _____

Its: _____

Agreed to and Accepted:

_____
Julius R. Nasso

INITIAL HERE: ____ _____   2
              NLAC    JRN

EXHIBIT "A"
## COLLATERAL DESCRIPTION

The "Collateral" means all of Mortgagor's right, title and interest, whether now owned or hereafter acquired, made, produced or created by Mortgagor, in and to the Work, including, without limitation, the following:

1.     Work Collateral and Copyright.  The Work and all rights therein and thereto, and all properties and things of value pertaining thereto, and all products and proceeds thereof, whether now in existence or hereafter made, acquired or produced (as used in this paragraph, the term the "Work" includes the Work (as defined in the main portion of this Copyright Mortgage and Assignment), all of the rights referred to above and the rights set forth in paragraphs 1.1 through 1.14, below), including, without limitation:

1.1     all rights of every kind and nature (including, without limitation, copyrights) in and to the literary material upon which, in whole or in part, the Work is or may be based, or which may be or has been used or included in the Work, including, without limitation, the Screenplay and all other scripts, scenarios, screenplays, bibles, stories, treatments, novels, outlines, books, titles, concepts, manuscripts or other properties or materials of any kind or nature in whatever state of completion, and all drafts, versions and variations thereof (collectively the "Literary Property");

1.2     all physical properties of every kind or nature of or relating to the Work and all versions thereof, including, without limitation, exposed film, developed film, positives, negatives, prints, answer prints, special effects, pre-print materials (including, without limitation, interpositives, negatives, duplicate negatives, internegatives, color reversals, intermediates, lavenders, fine grain master prints and matrices, and all other forms of pre-print elements which may be necessary or useful to produce prints or other copies or additional pre-print elements, whether now known or hereafter devised), soundtracks, recordings, audio and video tapes and discs of all types and gauges, cutouts, trims and any and all other physical properties of every kind and nature relating to the Work in whatever state of completion, and all duplicates, drafts, versions, variations and copies of each of the foregoing (collectively the "Physical Property");

1.3     all rights to perform, copy, record, re-record, produce, reproduce and synchronize any or all music and musical compositions created for, used in or to be used in connection with the Work, and all other rights of every kind and nature in and to any and all of the music and musical compositions created for, used in or to be used in connection with the Work, including, without limitation, all copyrights therein, as well as all other rights to exploit such music, including, without limitation, record, soundtrack recording and music publishing rights;

1.4     all collateral, allied, ancillary and subsidiary rights of every kind and nature, without limitation, derived from, appurtenant to or related to the Work or the Literary Property, including, without limitation, all production, exploitation, reissue, remake, sequel, serial or series production rights by use of film, tape or any other recording devices now known or hereafter devised, whether based upon, derived from or inspired by the Work, the Literary Property or any part thereof; all rights to use, exploit and license others to use or exploit any and all novelization, publishing, commercial tie-ups and merchandising rights of every kind and nature, including, without limitation, all novelization, publishing, merchandising rights and commercial tie-ups arising out of, connected with or inspired by the Work or the Literary Property; the title or titles of the Work, the characters appearing in the Work or the Literary Property and the names and characteristics of such characters; and any and all commercial exploitation in

INITIAL HERE: 
NLAC          JRN

3

EXHIBIT "A"
## COLLATERAL DESCRIPTION

The "Collateral" means all of Mortgagor's right, title and interest, whether now owned or hereafter acquired, made, produced or created by Mortgagor, in and to the Work, including, without limitation, the following:

1.     <u>Work Collateral and Copyright</u>.  The Work and all rights therein and thereto, and all properties and things of value pertaining thereto, and all products and proceeds thereof, whether now in existence or hereafter made, acquired or produced (as used in this paragraph, the term the "Work" includes the Work (as defined in the main portion of this Copyright Mortgage and Assignment), all of the rights referred to above and the rights set forth in paragraphs 1.1 through 1.14, below), including, without limitation:

1.1     all rights of every kind and nature (including, without limitation, copyrights) in and to the literary material upon which, in whole or in part, the Work is or may be based, or which may be or has been used or included in the Work, including, without limitation, the Screenplay and all other scripts, scenarios, screenplays, bibles, stories, treatments, novels, outlines, books, titles, concepts, manuscripts or other properties or materials of any kind in whatever state of completion, and all drafts, versions and variations thereof (collectively the "Literary Property");

1.2     all physical properties of every kind or nature of or relating to the Work and all versions thereof, including, without limitation, exposed film, developed film, positives, negatives, prints, answer prints, special effects, pre-print materials (including, without limitation, interpositives, negatives, duplicate negatives, internegatives, color reversals, intermediates, lavenders, fine grain master prints and matrices, and all other forms of pre-print elements which may be necessary or useful to produce prints or other copies or additional pre-print elements, whether now known or hereafter devised), soundtracks, recordings, audio and video tapes and discs of all types and gauges, cutouts, trims and any and all other physical properties of every kind and nature relating to the Work in whatever state of completion, and all duplicates, drafts, versions, variations and copies of each of the foregoing (collectively the "Physical Property");

1.3     all rights to perform, copy, record, re-record, produce, reproduce and synchronize any or all music and musical compositions created for, used in or to be used in connection with the Work, and all other rights of every kind and nature in and to any and all of the music and musical compositions created for, used in or to be used in connection with the Work, including, without limitation, all copyrights therein, as well as all other rights to exploit such music, including, without limitation, record, soundtrack recording and music publishing rights;

1.4     all collateral, allied, ancillary and subsidiary rights of every kind and nature, without limitation, derived from, appurtenant to or related to the Work or the Literary Property, including, without limitation, all production, exploitation, reissue, remake, sequel, serial or series production rights by use of film, tape or any other recording devices now known or hereafter devised, whether based upon, derived from or inspired by the Work, the Literary Property or any part thereof; all rights to use, exploit and license others to use or exploit any and all novelization, publishing, commercial tie-ups and merchandising rights of every kind and nature, including, without limitation, all novelization, publishing, merchandising rights and commercial tie-ups arising out of, connected with or inspired by the Work or the Literary Property; the title or titles of the Work, the characters appearing in the Work or the Literary Property and the names and characteristics of such characters; and any and all commercial exploitation in

INITIAL HERE:   _____      3
                NLAC      BRN

connection with or related to the Work, and all remakes of or sequels to the Work and the Literary Property;

      1.5    all rights of every kind or nature, present and future, in and to all agreements relating to the development, production, completion, delivery and exploitation of the Work, including, without limitation, all agreements for personal services (including, without limitation, the services of writers, directors, cast, producers, special effects personnel, animators, cameramen and other creative, artistic and technical staff) and agreements for the use of studio space, equipment, facilities, animation services, special effects services and laboratory contracts;

      1.6    all insurance and insurance policies obtained in connection with the Work, the insurable properties thereof or any person or persons engaged in the development, production, completion, delivery or exploitation of the Work, and the proceeds of all of the foregoing;

      1.7    all copyrights and renewals and extensions of copyrights, domestic and foreign, heretofore or hereafter obtained in the Work or the Literary Property or any part thereof, and the right (but not the obligation) to publish the same for copyright purposes, to register claim under copyright, to renew and extend such copyrights and the right (but not the obligation) to sue in the name of Mortgagor or Mortgagee (or both) for past, present or future infringements of copyright;

      1.8    all rights to produce, release, sell, distribute, lease, market, license, exhibit, broadcast, reproduce, publicize or otherwise exploit the Work, the Literary Property and any and all rights therein, in perpetuity, without limitation, in any manner and in any media whatsoever, throughout the universe, including, without limitation, by projection, radio, all forms of television (including, without limitation, free, pay, toll, cable, sustaining, subscription, sponsored and direct satellite broadcast), in theatres, non-theatrically, on cassettes, cartridges, discs, DVDs and other similar and dissimilar video devices, and by any and all other scientific, mechanical or electronic means, methods, processes or devices now known or hereafter conceived, devised or created;

      1.9    all right, title and interest in and to the Distribution Agreements, the Sales Agency Agreement, and all other agreements licensing, granting or selling rights to distribute, broadcast, exhibit or otherwise exploit the Work or rights therein, including, without limitation, any and all rights relating to merchandising, publishing, music and phonorecords derived from or connected with the Work, and the proceeds of all of said agreements;

      1.10    all rent, revenues, income, compensation, products, increases, proceeds and profits or other property obtained or to be obtained from the production, sale, distribution, marketing, licensing, exhibition, reproduction, publication, ownership, exploitation or other uses or disposition of the Work and the Literary Property (or any rights therein or part thereof), in any and all media, without limitation, the properties thereof and of any collateral, allied, ancillary and subsidiary rights and any and all merchandising and publishing rights therein and thereto, and amounts recovered as damages by reason of unfair competition, copyright infringement, breach of contract or infringement of any other rights, or derived therefrom in any manner whatsoever;

      1.11    any and all accounts, deposit accounts (including, without limitation, the Collection Account), accounts receivable, general intangibles, contract rights, chattel paper, documents, instruments and goods, including, without limitation, inventory (as those terms are defined in the California Commercial Code), not elsewhere included in this definition, which may arise in connection with the production, sale, distribution or exploitation of the Work or any element thereof;

INITIAL HERE:    _____

      NLAC     JRN

4

connection with or related to the Work, and all remakes of or sequels to the Work and the Literary Property;

1.5    all rights of every kind or nature, present and future, in and to all agreements relating to the development, production, completion, delivery and exploitation of the Work, including, without limitation, all agreements for personal services (including, without limitation, the services of writers, directors, cast, producers, special effects personnel, animators, cameramen and other creative, artistic and technical staff) and agreements for the use of studio space, equipment, facilities, animation services, special effects services and laboratory contracts;

1.6    all insurance and insurance policies obtained in connection with the Work, the insurable properties thereof or any person or persons engaged in the development, production, completion, delivery or exploitation of the Work, and the proceeds of all of the foregoing;

1.7    all copyrights and renewals and extensions of copyrights, domestic and foreign, heretofore or hereafter obtained in the Work or the Literary Property or any part thereof, and the right (but not the obligation) to publish the same for copyright purposes, to register claim under copyright, to renew and extend such copyrights and the right (but not the obligation) to sue in the name of Mortgagor or Mortgagee (or both) for past, present or future infringements of copyright;

1.8    all rights to produce, release, sell, distribute, lease, market, license, exhibit, broadcast, reproduce, publicize or otherwise exploit the Work, the Literary Property and any and all rights therein, in perpetuity, without limitation, in any manner and in any media whatsoever, throughout the universe, including, without limitation, by projection, radio, all forms of television (including, without limitation, free, pay, toll, cable, sustaining, subscription, sponsored and direct satellite broadcast), in theatres, non-theatrically, on cassettes, cartridges, discs, DVDs and other similar and dissimilar video devices, and by any and all other scientific, mechanical or electronic means, methods, processes or devices now known or hereafter conceived, devised or created;

1.9    all right, title and interest in and to the Distribution Agreements, the Sales Agency Agreement, and all other agreements licensing, granting or selling rights to distribute, broadcast, exhibit or otherwise exploit the Work or rights therein, including, without limitation, any and all rights relating to merchandising, publishing, music and phonorecords derived from or connected with the Work, and the proceeds of all of said agreements;

1.10    all rent, revenues, income, compensation, products, increases, proceeds and profits or other property obtained or to be obtained from the production, sale, distribution, marketing, licensing, exhibition, reproduction, publication, ownership, exploitation or other uses or disposition of the Work and the Literary Property (or any rights therein or part thereof), in any and all media, without limitation, the properties thereof and of any collateral, allied, ancillary and subsidiary rights and any and all merchandising and publishing rights therein and thereto, and amounts recovered as damages by reason of unfair competition, copyright infringement, breach of contract or infringement of any other rights, or derived therefrom in any manner whatsoever;

1.11    any and all accounts, deposit accounts (including, without limitation, the Collection Account), accounts receivable, general intangibles, contract rights, chattel paper, documents, instruments and goods, including, without limitation, inventory (as those terms are defined in the California Commercial Code), not elsewhere included in this definition, which may arise in connection with the production, sale, distribution or exploitation of the Work or any element thereof;

INITIAL HERE: 
  NLAC        JRN

4

1.12 any and all documents, receipts or books and records, including, without limitation, documents or receipts of any kind or nature issued by any pledgeholder, warehouseman or bailee with respect to the Work or any element thereof;

1.13 all tax benefits, incentives, subsidies, sale-lease back transactions and other similar arrangements, tax advantage transactions, product placement proceeds and other forms of state or private aid that shall accrue to the Mortgagor in connection with the Work; and

1.14 All cash and non-cash proceeds, products, additions and accessions (including, without limitation, insurance proceeds) of the Work, as defined and referred to in paragraphs 1.1 through 1.13, above;

2. <u>Personal Property</u>. The following personal property, whether now owned or hereafter acquired, and the proceeds thereof: (i) all of Mortgagor's rights in and to the title of the Work and the exclusive use thereof including, without limitation, any and all rights protected pursuant to trademark, service mark, unfair competition or other laws, rules or principles of law or equity and (ii) all rights in and to any and all inventions, processes, formulae, licenses, patents, patent rights, trademarks, trademark rights, service marks, service mark rights, trade names, trade names, trade name rights, logos, indicia, corporate and company names, business source or business identifiers and renewals and extensions thereof, domestic and foreign, relating to the Work, whether now owned or hereafter acquired, and the accompanying good will and other like business property rights, and the right (but not the obligation) to register claim under trademark or patent and to renew and extend such trademarks or patents, and the right (but not the obligation) to sue in the name of Mortgagor or Mortgagee (or both) for past, present or future infringement of trademark or patent.

3. <u>Cash</u>. All of Mortgagor's cash and cash equivalents derived from or relating to the Work and all drafts, checks, certificates of deposit, notes, bills of exchange and other writings relating to the Work which evidence a right to the payment of money and are not themselves security agreements or leases and are of a type which, in the ordinary course of business, is transferred by delivery with any necessary endorsement or assignment whether now owned or hereafter acquired.

4. <u>Equipment</u>. All machinery, electrical and electronic components, equipment, fixtures, furniture, office machinery, vehicles, trailers, implements and other tangible personal property of every kind and description now owned or hereafter acquired by Mortgagor and used in connection with the Work (including without limitation, all wardrobe, props, mikes, scenery, sound stages, movable, permanent or vehicular dressing rooms, sets, lighting equipment, cameras and other photographic, sound recording and editing equipment, projectors, film developing equipment and machinery), and all goods of like kind or type hereafter acquired by Mortgagor in substitution or replacement thereof, and all additions and accessions thereto (collectively the "Equipment") and all rents, proceeds and products of the Equipment, including, without limitation, the rights to insurance covering the Equipment.

INITIAL HERE: _NLAC_ _____

NLAC    JRN

5

# EXHIBIT 3

## CONTINUING CORPORATE GUARANTY AGREEMENT

This Guaranty Agreement ("Guaranty") is made effective as of November 1, 2012, by Nailed Loan Acquisition Company, LLC, a Delaware limited liability company ("Guarantor"), 2425 Colorado Avenue, Suite #205, Santa Monica, California 90404.

This Guaranty is being given to Julius R. Nasso ("JRN") 16 Wakefield Road, Staten Island, NY 10312.

This Guaranty is being given for the benefit of JRN for amounts loaned up to and including Six Hundred Thousand Dollars ($600,000.00) ("principal amount") (plus interest and fees thereon; all as specified in the secured promissory note ["Note"] executed concurrently herewith) lent to Integrated Administration, Inc. ("Borrower") for and in connection with partial production financing of the motion picture photoplay currently entitled, "NAILED" ("Picture"). Such financing is partly supported by the Note (executed in favor of JRN) reflecting the principal amount with the same being made and delivered by Borrower, which is an affiliate of Guarantor. As an inducement for such loan (acknowledging that the same is for the benefit of Guarantor), Guarantor has agreed to deliver concurrently to JRN this Guaranty and that certain Security Agreement & Copyright Mortgage, pursuant to which JRN shall obtain a security interest in the Picture and its proceeds.

1. **Obligations.** This Guaranty is given by Guarantor to induce JRN to advance the principal amount to the production of the Picture; and in consideration of JRN doing so, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and further acknowledging that JRN intends to rely on this Guaranty, Guarantor absolutely and unconditionally guarantees payment when due of all payments and liabilities of Borrower to JRN pursuant to the terms and conditions of any agreements ("Agreements"); including but not limited to the Note; concerning the Picture, between Borrower and JRN regardless of whether Borrower may be liable individually or jointly; and regardless of whether recovery upon any such obligation (including interest and charges) as to Borrower, may be or hereafter become barred or otherwise unenforceable and to the extent prohibited by law.

2. **Limitation of Amount and Purpose.** The liability of Guarantor pursuant to this Guaranty (exclusive of any costs and expenses incurred by JRN to realize upon this Guaranty) shall be limited to the sum of US$600,000 (Six Hundred Thousand Dollars) owing to JRN from Borrower (plus interest thereon, as specified in the Note) but always subject to a credit in reduction thereof to reflect payment received by JRN or for the benefit of JRN prior to the date JRN seeks to enforce this Guaranty against Guarantor.

3. **Duration.** This is a continuing Guaranty and shall not be revoked by Guarantor. This Guaranty shall remain in effect until all obligations guaranteed by this Guaranty are fully discharged.

4. **Waiver Notice of Default.** Guarantor hereby waives any notice of Borrower's default as a condition precedent to the exercise of JRN's rights hereunder.

1

**5.  Assignment.**  This Guaranty (a) shall bind the successors and assigns of Guarantor (provided, however, that this Guaranty is not assignable by Guarantor without the express written consent of the JRN, which shall not be unreasonably withheld if the proposed assignee shall have acquired substantially all of Guarantor's assets, a controlling interest in its voting interests; shall have expressly assumed in writing Guarantor's obligations to JRN hereunder and shall be of a financial strength then comparable to that of the Guarantor), (b) shall inure to JRN, its successors and assigns, and (c) may be enforced by any party to whom all or any part of the liabilities may be sold, transferred or assigned by JRN.

**6.  Entire Agreement.**  This Guaranty contains the entire agreement of the Parties with respect to the subject matter of this Guaranty and there are no promises or conditions in any other agreement, whether written or verbal that served to induce any party to execute this Guaranty, which are not expressly set forth herein.  This Guaranty supersedes any prior and contemporaneous written or verbal agreements between the parties with respect to the subject matter of this Guaranty.

**7.  Amendment.**  This Guaranty may be modified or amended, if the amendment is made in writing and is signed by Borrower, JRN and Guarantor.

**8.  Severability.**  The invalidity or unenforceability of any particular provision of this Guaranty shall not affect the other provisions, and this Guaranty shall be construed in all respects as if such invalid or unenforceable provisions were omitted.

**9.  Waiver.**  Neither the failure nor any delay on the part of any party hereto in exercising any right, power or remedy hereunder shall operate as a waiver thereof, or of any other right, power or remedy; nor shall any single or partial exercise of any right, power or remedy, preclude any further or other exercise thereof, or the exercise of any other right, power or remedy.

**10.  Applicable Law.**  This Agreement shall be governed by and construed in accordance with the laws of the State of California, without regard to conflict of law principles.  The parties hereto agree that jurisdiction and venue for any action related to this Agreement shall lie in the state and federal courts in and for Los Angeles County, California.

**Guarantor:**

Nailed Loan Acquisition Company, LLC

By _____
    MANAGER

2

Agreed to and accepted:

Approved as to form and content:

Integrated Administration, Inc.

By: _____

By: _____

Julius R. Nasso

an authorized signer

3

Agreed to and accepted:                Approved as to form and content:

                                        Integrated Administration, Inc.


By: _____            By: _____
    Julius R. Nasso                          an authorized signer

3